UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

YAKOV WEINGARTEN
  a/k/a "YAAKOV,"
  a/k/a "YANKEV NACHUM,"
  a/k/a "YAKOV NACHUM,"
SHMIEL WEINGARTEN, and
YOIL WEINGARTEN,
  a/k/a "YOLE,"
  a/k/a "YOEL,"

               Defendants.

S3 19 Cr. 497 (NSR)

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIEN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Sam Adelsberg
Jamie Bagliebter
Jim Ligtenberg
Assistant United States Attorneys
    -Of Counsel-

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

YAKOV WEINGARTEN
  a/k/a "YAAKOV,"
  a/k/a "YANKEV NACHUM,"
  a/k/a "YAKOV NACHUM,"
SHMIEL WEINGARTEN, and
YOIL WEINGARTEN,
  a/k/a "YOLE,"
  a/k/a "YOEL,"

                 Defendants.

S3 19 Cr. 497 (NSR)

---

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in support of motions *in limine* for the admission at trial of (i) testimony regarding instances of uncharged criminal conduct, wrongs, or bad acts in connection with the rules within the Lev Tahor community; and (ii) statements by co-conspirators in furtherance of the conspiracy, which are admissible pursuant to Rule 801(d)(2)(E) and/or statements against the declarants' penal interest under Rule 804(b)(3). The Government also seeks (i) to preclude the defense from raising several irrelevant arguments during trial, and (ii) to admit into evidence certain business records on the basis of written declarations pursuant to Rule 803(6) and 902(11).

Shmiel Weingarten ("Shmiel"), Yoil Weingarten ("Yoil") and Yakev Weingarten ("Yakev")[2] (together, the "Weingartens" or the "Defendants") are U.S. citizens charged in a six-count Indictment (the "Indictment") with (i) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a), (e) ("Count One"); (ii) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. §§ 2423(b), (e) ("Count Two"); (iii) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371 ("Count Three"); and (iv) two counts of international parental kidnapping, in violation of 18 U.S.C. § 1204, in connection with a December 2018 kidnapping ("Count Four" and "Count Five"). Yakev is also charged with an additional count of international parental kidnapping in violation of 18 U.S.C. § 1204 in connection with a March 2019 attempted kidnapping (together with Count Four and Count Five, "the Kidnapping Counts"). The charges stem from the Weingartens' roles in the kidnapping of two minor children from New York and the desire to return one of the children ("Jane Doe")—then a 14-year old girl—to her 20-year-old "husband" so that they could have sex—sex that, given their ages, would be illegal.

The Government expects to prove at trial that the Defendants were all leaders of a religious community called Lev Tahor. Starting in approximately 2017, Nachman Helbrans ("Helbrans") assumed the top leadership position of the community, with Mayer Rosner ("Rosner") serving as

---

[1] The Government respectfully submits that all of the testimony and other evidence described in this brief is admissible as direct evidence of the crimes charged. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b). The Government plans to continue to meet with potential witnesses between now and the trial, and will supplement this notice as necessary should the Government learn of additional evidence.

[2] While the Indictment charges "Yakov" Weingarten, the Government understands that the correct spelling of the defendant's first name is "Yakev."

his lieutenant. Helbrans, Rosner and the Weingartens, among various others, were known within the community as the "Hanhala" (translation: management) of Lev Tahor. Helbrans established the rules for the community and, together with the Hanhala, managed the operational affairs of the community. These community rules covered every aspect of the lives of Lev Tahor's adherents, including their studies, their daily schedules, their interactions with family members, their interactions with individuals outside of Lev Tahor, and their diets. In addition, the Hanhala enlisted members of the community to assist in enforcing the community rules.

When Helbrans assumed leadership of the community following his father's death, he and the rest of the Hanhala seized even greater control over the community by implementing more restrictive rules. These new rules, among other things, involved even closer monitoring of members, stricter dietary limitations, and increased forced separations of family members. As discussed further below, these new rules also required forced marriages of minors. The Government expects to prove at trial that the Hanhala was intimately involved in arranging marriages involving minors. In particular, when Jane Doe was 12 years old, Helbrans arranged Jane Doe's engagement to co-defendant (and the son of Mayer Rosner) Jacob Rosner, who was 18 years old at the time. Jane Doe and Jacob Rosner were religiously "married" when she was 13 and he was 19. Following the "marriage," Jacob regularly had sex with then 13-year-old Jane Doe.

In approximately October 2018, the mother of Jane Doe (the "Mother") determined that it was no longer safe for her children to remain under the authority of her brother, Helbrans, the leader of Lev Tahor. She escaped from the community's compound and—with the help of U.S. authorities—arrived in the United States in early November 2018.[3] On or about November 14,

---

[3] While the Mother was only able to escape from the community's compound with three of her children, all six of the children were eventually reunited with her in New York. Three of her children, including the Victims, were brought to the United States only after members of Lev

3

2018, a Temporary Order of Custody and a Temporary Order of Protection were issued in Kings County Family Court granting the Mother temporary custody of all six children, including Jane Doe and her 12-year-old brother ("John Doe," and together with Jane Doe, the "Victims").  Those orders also prohibited Aaron Teller, the children's father and a leader within Lev Tahor, from having any communication with the children.

In the wake of the Mother fleeing with her children and settling in New York, Helbrans, the Weingartens and their co-conspirators devised a plan to return the Victims (then 14 and 12 years old) to Lev Tahor (the "December Kidnapping").  And at approximately 3 a.m. on December 8, 2018, they executed that plan: Helbrans and his co-conspirators kidnapped the Victims from a home in Woodridge, New York (the "Residence").[4]  The planning for this operation, however, began far before the early morning hours of December 8, 2018.  In the days and weeks before the abduction, Helbrans and his co-conspirators—including the Weingartens—took several preparatory steps to ensure its success including, among other things: (1) bringing Jane Doe a cellphone so that the kidnappers could communicate with her;[5] (2) traveling to the United States and/or Mexico from Guatemala; (3) renting a car to use during the kidnapping; (4) purchasing secular clothing to use as disguises for themselves and the Victims; (5) purchasing cellphones to use only for kidnapping-related matters; (6) conducting multiple meetings and phone/text

---

Tahor, including someone posing as the Mother, attempted to fraudulently procure new passports for the children at a U.S. Consulate in Mexico on or about November 8, 2018.  This effort was disrupted by law enforcement and the Mother's remaining children, including the Victims, were reunited with her in New York.

[4] It does not appear that Yoil Weingarten or Yakev Weingarten were in the United States during the planning of the December Kidnapping.  As described below, however, both Yoil and Yakev participated in the planning and execution of the December Kidnapping in various ways.

[5] The Government does not believe that the Victims were kidnapped by force.  Rather, the evidence demonstrates that, under immense pressure from the defendants, the Victims did not resist the defendants' efforts to kidnap them.

conversations about the logistics of the kidnapping; (7) transferring money amongst themselves to help fund the kidnapping; (8) purchasing flights for themselves and the Victims to be able to leave the country; and (9) obtaining two of Helbrans' children's passports for the Victims to use to get out of the United States undetected. The kidnapping plan also involved enlisting—through a mix of coercion and cajoling—a former Lev Tahor community member ("CC-1") to assist in the effort.

On December 4, 2018, approximately four days before the December Kidnapping, several of the kidnappers met in Brooklyn, New York. During this meeting, the defendants decided to secretly deliver a cellular telephone to Jane Doe to communicate with her about the plans for the kidnapping. Two days later, the defendants met again for another planning meeting. During this meeting, Mayer Rosner and Yoil Weingarten participated by telephone. At that point, the plan involved taking the Victims from the Residence in the middle of the night. Jacob Rosner was going to meet the Victims outside the Residence and help them get to the airport, where Helbrans would be waiting for them. While preparing for the kidnapping, Shmiel told CC-1 that the purpose of the kidnapping was to reunite Jane Doe with her adult husband, Jacob Rosner.

On the evening of December 7, 2018, the Victims were in Woodridge, New York celebrating the Jewish holiday of Hanukah alongside other former Lev Tahor community members, including CC-1, and their allies in the New York Jewish community. At approximately 3 a.m. the following morning, with CC-1's assistance, the Victims left the Residence and entered a waiting vehicle. Several defendants, including Helbrans and Shmiel, were waiting inside the vehicle.

Wasting no time, Helbrans, Shmiel and their confederates immediately took the Victims to a nearby hotel where the children were given new clothes to change into before being driven to Scranton International Airport in Pennsylvania. The hotel room was reserved under Shmiel's

name. The kidnappers also gave the Victims airplane tickets and passports that contained the names of two of Helbrans' children. Helbrans and the Victims, using disguises meant to conceal their identities, proceeded through airport security in Scranton. They then flew to Washington D.C., then to Texas, and then took a bus across the border to Mexico. Shmiel, Jacob Rosner, and Mordechay Malka took separate routes out of the country, all finding their way to Mexico.

Once in Mexico, Jane Doe was reunited with Jacob, along with Yoil and other coconspirators, in Mexico City and transported to several hotels and residences. During this period, the kidnappers sought and received logistical help from members of Lev Tahor in the United States, Mexico, and Guatemala, including Yakev. At various times, Helbrans and the Victims were met by other co-conspirators, including Rosner and his son, Jacob Rosner (Victim-1's adult "husband"). On or about December 18, 2018, Mexican law enforcement raided what appeared to be a Lev Tahor safe house in San Miguel Tlaixpan, Mexico, and detained Helbrans, Mayer Rosner, Jacob Rosner, and Matityau Malka, among other individuals. These defendants were subsequently deported to the United States. The Victims were in the same residence at the time of the defendants' arrests, but they were hidden in a closet and were not detected by Mexican authorities.

Left alone in the house in San Miguel Tlaixpan, the Victims got in touch with Yoil by using an abandoned cellphone in the house. Yoil instructed the Victims to go to another person's home

where Yoil and Shmiel met the Victims. Yoil and Shmiel then transported the Victims to multiple homes and had them wear dark makeup on their faces to conceal their identities.

Finally, on December 27, 2018, the Victims were recovered in a hotel in Mexico. At the time, they were accompanied by defendants Shmiel and Yoil.

In March 2019, approximately four months after the December Kidnapping, Yakev—along with Helbrans and Matityau Malka—attempted to kidnap Jane Doe a second time (the "March Attempted Kidnapping"). During this attempt, Matityau Malka ("Matityau") approached Jane Doe, who was living with the Mother in Brooklyn, on several occasions. During these encounters, Matityau provided Jane Doe with cellular telephones so that she could communicate with the kidnappers.

In particular, Jane Doe used these phones to communicate with Yakev, who was acting as the head of the community following Helbrans' incarceration in December 2018. Those discussions included plans to remove Jane Doe from New York in a similar manner as the December 2018 Kidnapping. Yakev also spoke with the Mother about the co-conspirators' plans to kidnap Jane Doe again, and threatened her by insisting that their efforts to return the Victims to Lev Tahor would not end until they were successful. Additionally, during a call from Westchester County Jail in March 2019, Helbrans told the Mother that he would take the children away from her.

Two years later, in March 2021, another member of Lev Tahor approached the Victims in New York and attempted to kidnap them once again. At the time of this attempted kidnapping, the Lev Tahor member possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Victims.

**ARGUMENT**

## I. The Court Should Admit The Defendants' Prior Bad Acts, Either as Direct Evidence or Pursuant to Rule 404(b)

At trial, the Government anticipates eliciting testimony from Jane Doe, the Mother, CC-1, and another former Lev Tahor member ("Witness-1")—each of whom testified in prior trials in this case—about the rules and practices within Lev Tahor. As detailed further below, this testimony is admissible as direct evidence of the kidnapping and sexual exploitation conspiracies. To the extent, however, that any of this testimony constitutes "evidence of any other crimes, wrong or act," it is admissible as direct evidence of the charged crimes, or, in the alternative, pursuant to Federal Rule of Evidence 404(b), to show the defendants' motive, intent, knowledge, opportunity, and a common scheme or plan.

### A. Applicable Law

#### 1. Other Acts Evidence as Intrinsic or Direct Proof

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

"An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). Uncharged acts are admissible in a conspiracy case where they are used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009). In other words, evidence of uncharged criminal activity is

8

admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (citation and internal quotation marks omitted); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007). Even if the evidence does not directly establish an element of the offense charged, it can be admitted "in order to provide background for the events alleged in the indictment." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted). "In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (citations omitted); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.").

## 2. Other Acts Evidence Pursuant to Rule 404(b)

Federal Rule of Evidence 404(b) provides, in relevant part, that:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

It is well established that evidence of uncharged crimes, wrongs, or other acts is admissible under Rule 404(b) if the evidence (1) is advanced for a proper purpose; (2) is relevant to an issue in the case; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect, and (4) if requested, is admitted with limiting instructions to the jury. *See United States v.*

*Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). The Second Circuit "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996)); *see also United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013).

The Supreme Court has recognized that other acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Trial courts, therefore, have broad latitude in determining whether to admit evidence pursuant to Rule 404(b). *Inserra*, 34 F.3d at 89.

Finally, it is proper for a trial court to admit "other crimes, wrongs, or acts" evidence if it helps to prove the existence of a common scheme or plan. *See* Fed. R. Evid. 404(b) (establishing that "evidence of any other crime, wrong, or act . . . may be admissible" to prove a "plan"); *United States v. Reed,* 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was ... admissible to show a common scheme or plan."); *Carofino v. Forester*, 450 F. Supp. 2d 257, 272 (S.D.N.Y. 2006) (noting that "evidence demonstrative of pattern" or a common scheme or plan "is admissible under Rule 404(b)"); *see also United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude of particular situations, which do not fall into simple categories.").

### 3. Rule 403

Regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 only if its probative value is not substantially outweighed by the danger of unfair prejudice. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (Evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]."); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." (citation and internal quotation marks omitted)). The fact that evidence may be damning does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972).

### B. Discussion

The Government anticipates testimony regarding the rules within the Lev Tahor community and how those rules were enforced, in order to prove the Weingarten's direct

involvement in both the sexual exploitation and kidnapping conspiracies. This testimony is expected to include some instances of uncharged criminal conduct or other wrongs or bad acts. For example, the Government anticipates that:

- CC-1 is expected to testify that one of the primary changes instituted when Helbrans took over as a leader of Lev Tahor was the introduction of arranged marriages of children as young as 12 or 13 years old. Jane Doe was one of the first examples of this policy change.

- CC-1 is expected to testify that members of the Hanhala were involved in arranging all of the marriages in the Lev Tahor community, including several that involved minor children.

- CC-1 is expected to testify that members of the Hanhala directed women in Lev Tahor to deliver babies inside their homes instead of at a hospital, particularly to conceal the ages of underage mothers.

- CC-1 is expected to testify that he attended Yakev's wedding to a 14-year-old girl in a secret ceremony in Canada. Witness-1 is also expected to testify about Yakev's secret wedding.

- Witness-1 is expected to testify that, when he was 25 years old, the leaders of Lev Tahor directed him to "marry" a 15-year-old girl, though they were not legally married at that time.

- Witness-1 is expected to testify that, prior to the wedding, Yakev and Yoil Weingarten provided him with instructions on how to have sex with his wife.

- Witness-1 is expected to testify that, during the night following his wedding, Rosner called him to inquire as to whether he had had intercourse with his wife.

- Witness-1 is expected to testify that, in the months following his wedding, Rosner talked to Witness-1 about Witness-1's sex life with his wife on multiple occasions.

- Witness-1 is expected to testify that the practice of underage marriages was common knowledge within the Lev Tahor community, that he observed multiple marriages of children, that members of the Hanhala were present for those weddings, and that some weddings involving children occurred in secret to hide the child marriages from outsiders.

This anticipated testimony is crucial to "provide the jury with the complete story of the crimes charged." *Inserra*, 34 F.3d at 89. Indeed, this testimony goes to the heart of the charged

conspiracy for several reasons. For this reason, the Court previously admitted this evidence in the trial against Helbrans and Rosner, finding the evidence to be "inextricably intertwined with the evidence regarding the charged offenses." (*See* Dkt. No. 388 ("Helbrans MIL Opinion") 35-36). The Court also previously admitted some of this evidence in the trial against Mordechay Malka and Matityau Malka because of their relevance to the kidnapping counts. (*See* Dkt. No. 625 "Malkas MIL Opinion" 19).

This testimony is highly relevant for several reasons. *First*, evidence of the defendants' and their coconspirators' involvement in child marriages, and in particular Jane Doe's child marriage, manifests their direct involvement in the child exploitation offenses charged in Counts One and Two. Indeed, Jane Doe and Jacob Rosner got married and engaged in illegal sexual intercourse because the Hanhala required them to do so. And, as the Government intends to prove at trial, a dominant purpose of the subsequent kidnapping was to continue Jane Doe and Jacob Rosner's illicit sexual relationship. Because evidence of how and when the Hanhala's dictates were implemented is crucial to explaining the charged conspiracies, this evidence is "inextricably intertwined with the evidence regarding the charged offense[s]," *Hsu*, 669 F.3d at 118, in that it "provide[s] background for the events alleged in the indictment," *Coonan*, 938 F.2d at 1561.

*Second*, this evidence is crucial to explaining the story of how the kidnapping unfolded. If the jury were deprived of evidence about the defendants' involvement in child marriages and the practices around marriage and sex in the Lev Tahor community, then the whole rationale for the Mother leaving Guatemala and the defendants subsequently executing a kidnapping would be without vital context. Indeed, a jury already found that a "dominant purpose" of the December Kidnapping was re-uniting Jane Doe with Jacob so that they would resume their sexual relationship

thus demonstrating how central Jane Doe's child marriage was to the kidnapping plot. Deleting this important fact from the narrative would thus leave a significant gap in the juror's minds.

And *third*, this evidence "explain[s] to the jury how the illegal relationship between the participants in the crime developed." *Pitre*, 960 F.2d at 1119. Lev Tahor is the connective tissue linking the Weingartens to their conspirators. Indeed, the Weingartens' roles and responsibilities as members of the Hanhala, and the way the Hanhala controlled every aspect of Lev Tahor members' lives and together made and enforced restrictive rules that all their community members were required to follow, explains why the Weingartens were willing to undertake crucial roles in the kidnappings.

In the alternative, this evidence is admissible pursuant to Rule 404(b) to show the defendants' motive, intent, knowledge, opportunity, and a common scheme or plan. The defendants may present some combination of the following arguments: (i) they were unaware of Jane Doe and Jacob Rosner's sexual relationship; (ii) they did not seek to facilitate the continuation of Jane Doe and Jacob Rosner's sexual relationship during or after the kidnapping; (iii) reuniting Jane Doe with Jacob Rosner was not a dominant purpose of the kidnapping; and/or (iv) Jacob Rosner was not acting at their direction in marrying Jane Doe, engaging in a sexual relationship with her, and/or participating in her kidnapping in order to continue their sexual relationship. Evidence of the rules within Lev Tahor surrounding familial, marital and sexual relationships would thus be highly probative evidence to rebut these potential defenses by demonstrating the defendants' motive, intent, and knowledge regarding their participation in the charged conspiracies. Moreover, this evidence manifests the defendants' "common scheme or plan" to facilitate the sexual exploitation of young girls by marrying them off to older men in their community. *Reed*, 639 F.2d at 906.

This evidence is also admissible under Rule 403. For the reasons stated above, such evidence is highly probative of the defendants' participation in the charged conspiracies. Moreover, the evidence is not any more inflammatory than the sexual exploitation offenses charged in the Indictment, *see Livoti*, 196 F.3d at 326, and, if admitted, would be presented in a streamlined way.

The Government therefore submits that this evidence should be admitted as direct evidence of the charged conspiracies or, in the alternative, pursuant to Rule 404(b) to show the defendants' motive, intent, opportunity, knowledge, and a common scheme or plan.

## II. Statements of the Defendants' Co-Conspirators Are Admissible at Trial

At trial, the Government intends to introduce certain statements made by the defendants' co-conspirators. These statements will be introduced through testimony from, among others, CC-1, the Mother, Jane Doe, and Witness-1, and through electronic evidence (including communications retrieved from cellphones). As discussed below, these statements are admissible as co-conspirator statements, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, and as statements against interest, pursuant to Rule 804(b)(3) of the Federal Rules of Evidence.[6]

### A. Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the

---

[6] In addition, several of these statements are non-hearsay because they are being offered not for the truth of the matter, but rather for the effect on the listener or another non-hearsay purpose.

statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir 1999). A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). Notably, Rule 801(d)(2)(E) does not require that a statement be made to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27-28 (1st Cir. 1989) (co-conspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E)) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive. It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Indeed, the requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).

The Second Circuit has found that co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends of the conspiracy, *United States v. Dresna*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator

of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Although the Government must show that the defendant and the declarant belonged to the same conspiracy, they both need not be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant. *See United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a co-conspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993); *United States* v. *Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *Maldonado-Rivera*, 922 F.2d at 962 (same).

The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must show only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See Stratton*, 779 F.2d at 829 (the Government must demonstrate that the conspiracy to which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also Lyles*, 593 F.2d at 194. This factual link requirement makes

logical sense—the co-conspirator statement should not be so far removed from the charged offense as to make its probative value questionable and cause unnecessary confusion or prejudice. *See Lyles*, 593 F.2d at 194.

Even to the extent that the statements the Government seeks to offer are not in furtherance of a conspiracy and therefore qualify as hearsay, the hearsay rule does not exclude the out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See* Fed. R. Evid. 804(b)(3); *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007). A statement is sufficiently against the declarant's penal interest if:

> a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or

testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning and not made in coercive atmospheres, are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994)

Moreover, although "non-self inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson*, 512 U.S. at 600-01, a statement describing inculpatory acts committed by the declarant and a defendant are admissible in full as statements against the declarant's self-interest, especially where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant], or curry favor with authorities." *Williams*, 506 F.3d at 155; *accord Wexler*, 522 F.3d at 203 (admitting statements that implicated both declarant and defendant); *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) (admitting taped conversations implicating both the declarant and the defendant in joint criminal activity).

Finally, because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause. *Williams*, 506 F.3d at 157.

## B. Discussion

Statements that the Weingarten's co-conspirators made during the course of the charged conspiracies, about charged conduct, and in furtherance of the conspiracies, are admissible as statements in furtherance of their shared conspiratorial ends.[7] These statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy" and thus should be admitted under Rule 801(d)(2)(E). *See Glenn*, 98 F.3d at 728. For example:

(i) CC-1 will testify that Mordechay Malka, a co-defendant, reported to him after the Victims were taken from the Residence that Jacob Rosner had been reunited with his wife.

(ii) A text message sent from Jacob Rosner on December 9, 2018—the day after Victims were abducted—in which Jacob Rosner inquires as to which room his wife is in.

(iii) A text message conversation from December 10, 2018 reflects Aron Rosner telling Yoil Weingarten that he lied to law enforcement to cast doubt on the veracity of Jane Doe's marriage to Jacob Rosner.

(iv) The Mother will testify about statements made to her by Nachman Helbrans in furtherance of the conspiracy, including during a call from Westchester County Jail in March 2019, in which Helbrans told the Mother that he would take the children away from her.

(v) The Mother will testify about March 2019 statements made to her by Yakov Weingarten about the co-conspirators' plans to kidnap Jane Doe again. Weingarten also threatened the Mother by insisting that their efforts to return the Victims to Lev Tahor would not end until they were successful.

---

[7] Statements made by the defendants themselves are also admissible as statements of a party opponent pursuant to Rule 801(d)(2)(A).

(vi)    Jane Doe will testify that multiple defendants told her to lie to people outside of Lev Tahor by telling them that she was not married and that she was older.[8]

These statements, among other similar statements, furthered the charged conspiracies in various ways, including by facilitating (i) the abduction of the Victims; (ii) the travel of the co-conspirators to the United States and then from the United States to Mexico in the time period surrounding the kidnapping; (iii) the marriage of Jane Doe and Jacob Rosner and their sexual relationship; (iv) the marriages of similarly situated minors in the community; and (v) the ability of the Weingartens and the Hanhala more broadly, to maintain control over the lives of the Lev Tahor community members, which allowed them to further the kidnapping and sexual exploitation conspiracies. Accordingly, the Court—just as it did in the trial against Helbrans and Rosner (*See* Helbrans MIL Opinion at 45) and the trial against Mordechay Malka and Matityau Malka (*See* Malkas MIL Opinion at 22-29)—should admit co-conspirator statements made in furtherance of the conspiracy.

Even to the extent that they are not statements in furtherance of a particular conspiracy, the statements regarding underage marriages and coercive practices in the Lev Tahor community are also admissible as statements against the declarants' penal interest. A number of the defendants' co-conspirators are located abroad (outside the Government's subpoena power), and all of the defendants' co-conspirators (including those who have already been convicted at trial in this case) would likely invoke the Fifth Amendment if they were questioned under oath regarding these activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y.

---

[8] The listed examples are intended to be illustrative, not exhaustive.

2013) (finding witness unavailable when located outside United States at time of trial). Moreover, statements by the defendants' co-conspirators, such as those described above, were plainly against the penal interest of the declarants because the statements "implicated" the declarants in the charged conspiracies, and each declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573. The statements are also sufficiently reliable because they were made either to other co-conspirators—*i.e.*, individuals "whom the declarant[s] believe[d] [to be] an ally"—or to others (such as the Mother, CC-1, or the Victims), who were "not [] law enforcement official[s]." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995). Finally, the statements do not reflect an "effort to shift blame" away from the declarants, and there is no possibility that they would have uttered these remarks "solely to curry favor with the authorities." *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift blame).

Although the Government believes the examples described above are among the most salient co-conspirator statements likely to be offered at trial, the Government cannot catalogue every possible co-conspirator statement. For one, the Mother, Jane Doe, CC-1, and other Lev Tahor survivors lived in the Lev Tahor community for many years and interacted regularly with the defendants throughout that time on matters directly relevant to the charged conspiracies. This Court need not, however, rule on any particular statement in advance of trial. The Second Circuit has made clear that "statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed. *United States v. Tracy,* 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v. Geaney,* 417 F.2d 116, 1120 (2d Cir. 1969));

*United States v. Labate,* 00 Cr. 632 (WHP), 2001 WL 533714, at *21 (S.D.N.Y. May 18, 2001)

("The Second Circuit has expressly approved the practice of conditionally admitting [801(d)(2)(E)] statements at trial, subject to the later submission of evidence necessary to make the preliminary pre-requisite findings . . . [And defendant] has provided no convincing reason to depart from this well-settled practice."). This Court can therefore await final determination on this matter until the close of evidence.

### III. The Court Should Preclude Several Possible Defense Arguments Because they are Irrelevant and Would Only Serve an Improper Purpose

In pretrial filings, statements in court, and correspondence with the Government, the Weingartens and their co-conspirators have raised several arguments as possible defenses. *See generally* Dkt. Nos. 316, 317, 318, 319, and 320. The Government anticipates that the defendants may raise some of these arguments at trial. For the reasons outlined below, the Government submits that these arguments—and any evidence or cross-examination predicated on these arguments—should be precluded because they are not relevant under Federal Rule of Evidence 401. And even if the arguments were relevant, they should be precluded under Rule 403 because they would only serve an improper purpose.

#### A. Applicable Law

Federal Rule of Evidence 401 requires that, to be admissible, evidence must have a "tendency to make a fact more or less probable" and "the fact [must be] of consequence in determining the action. *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019). Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and the party introducing evidence carries the burden of establishing its relevance. *See Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990).

Even if evidence is relevant, it can be excluded "if its probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. The court may exclude evidence that has "an undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." Fed. R. Evid. 403, Adv. Comm. Notes.

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

**B.      Discussion**

The Court should preclude defense counsel from eliciting testimony or making arguments relating to the following issues:

- **The Court should preclude the Defendants from arguing that they have been historically persecuted by the United States and/or Israel.**

  The Court previously precluded arguments about purported historical persecution by the United States or any other country (*see* Helbrans MIL Opinion at 70-71; Malkas MIL Opinion at 41) and should do the same here. For one, such arguments are plainly irrelevant to the charges. *United States v. Prince-Oyibo*, 320 F.3d 494, 501-02 (7th Cir. 2003) (affirming lower court's exclusion of evidence of religious persecution as being irrelevant); *cf. United States v. Stewart,* 433 F.3d 273, 311-12 (2d Cir. 2006) (rejecting appellants' argument that "they were unfairly restricted from putting on a defense" where the evidence they sought to introduce "would have increased the potential for confusion and were not relevant to the charges under consideration"). Furthermore, applying Rule 403, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by appealing to sympathy. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming district court's exclusion of evidence that defendant's son had cerebral palsy because such evidence "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case"); *United States v. Sabir*, No. 5-CR-673 (LAP), 2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007) (excluding evidence

because it "would suggest that the jurors should have sympathy for Dr. Sabir because of his troubled childhood and would implicitly encourage them to nullify by acquitting him based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt"); *United States v. Crown*, No. 99-CR-1044 (AGS), 2000 WL 709003, at *3 (S.D.N.Y. May 31, 2000) (precluding evidence regarding defendant's medical condition as irrelevant and holding that even if the evidence were relevant, "its probative value would be outweighed by its potential prejudicial effect on the jury" because it "would likely appeal to the jury's sympathy, and thus constitute an improper influence on the jury members' consideration of the factual and legal issues bearing on the merits of the case").

- **The Court should preclude the Defendants from arguing that they are being prosecuted because of their religious views.**

  The Court should also reaffirm its prior rulings (Helbrans MIL Opinion at 68-69; Malkas MIL Opinion at 42-43) and preclude any argument that the Defendants are only being prosecuted because of their religious views. "In this Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983). Furthermore, because "a selective prosecution defense alleges a defect in the institution of the prosecution, [it] is an issue for the court rather than the jury." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks omitted). Accordingly, courts in this Circuit routinely preclude defense arguments predicated on the theory that the defendant is being selectively prosecuted, including on the basis of their religion. *See Farhane*, 634 F.3d at 127 (holding that the district court did not abuse its discretion in precluding defendant from arguing in summation that the Government had targeted him for prosecution based on his religion); *United States v. Loera*, No. 09 Cr. 466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (precluding defense arguments to the jury that the Government's motives were improper); *United States v. Stewart*, No. 03 Cr. 717(MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (same). The Court should do the same here.

- **The Court should preclude the Defendants from arguing that Jane Doe's marriage to Jacob Rosner was a legitimate marriage, that their marriage somehow is a defense to the kidnapping, or that the marital privilege applies.**

  The Court should also once again preclude any argument that Jane Doe's religious marriage to Jacob Rosner somehow is a defense to otherwise illegal conduct. (*See* Helbrans MIL Opinion at 67 ("The Court further notes that religious motivation is not a defense to otherwise criminal conduct."); Malkas MIL Opinion at 49). The Court should follow its prior rulings and preclude any argument that Jane Doe's religious marriage to Jacob Rosner was a legally valid marriage, that it somehow is a defense to the kidnapping, or that it forms the basis of a marital privilege. As an initial matter, the fact that Jacob and Jane Doe were religiously married cannot form the basis of a defense to the charged crimes. Section 1204 understandably includes no exception or

affirmative defense for married children. Furthermore, the Court has already concluded that Jane Doe's marriage to Jacob was not legally valid and no marital privilege applies to communications between Jane Doe and Jacob. (*See* Dkt. No. 427 at 8 ("Because no party has provided the Court with cognizable evidence that Guatemalan law recognized Jane and Jacob's marriage, the Court must conclude that the marriage was not legally valid, and, therefore, that no marital privileges preclude Jane Doe from testifying regarding communications between Jane and Jacob or against Jacob and his alleged coconspirators.")). Accordingly, the Court should apply those same rulings here and preclude the Defendants from arguing that Jane Doe's religious marriage to Jacob was legitimate, is a defense to the kidnapping, or that the marital privilege applies. Likewise, the Court should preclude the Defendants from referencing the current relationship between Jane Doe and Jacob, as the status of that relationship in 2024 has no bearing on criminal activity that took place in 2018 and 2019.

- **The Court should preclude the Defendants from arguing that, because the marriage between Jane Doe and Jacob Rosner was predicated on their religious beliefs, it cannot form the basis for a criminal charge.**

The Court should preclude any argument that the sexual relationship at the heart of Jane Doe's purported marriage to Jacob Rosner is predicated on the defendants' religious convictions and thus cannot form the basis of a criminal charge. Courts have been clear that religious motivation is not a defense to otherwise criminal conduct. *See, e.g.*, *United States v. Cleveland*, 329 U.S. 14, 20 (1946) (holding that the fact that a practice "is supported by a religious creed affords no defense in a prosecution" for that conduct because to hold otherwise "would place beyond the law any act done under claim of religious sanction"); *United States v. Rahman*, 189 F.3d 88, 135 (2d Cir. 1999) ("If the evidence showed that [the defendant] conspired to levy war against the United States or solicited others to commit crimes of violence . . . it would not constitute a defense that he was justified in doing so within a framework of Islamic Law."). Any argument, evidence, witnesses, or cross-examination based on the premise that the defendants' religious beliefs excuse their conduct should therefore be precluded as irrelevant and prejudicial. (*See* Malkas MIL Opinion at 42-43).

- **The Court should preclude the Defendants from arguing that the Victims' consent to traveling with the Defendants out of the country and Jane Doe's consent to have sex with an adult excuse the Defendants' conduct.**

Any arguments centered on Jane Doe's supposed consent to be transported or to marry and have sex with an adult are irrelevant as consent is not a valid defense under § 2423. *See, e.g.*, *Gebardi v. United States*, 287 U.S. 112, 119 (1932) (the Mann Act "is drawn to include those cases in which the woman consents to her own transportation"); *United States v. Brooks*, 610 F.3d 1186, 1199 (9th Cir. 2010) ("[T]he victim's willingness to engage in sexual activity is irrelevant, in much the same way that a minor's consent to sexual activity does not mitigate the offense of statutory rape or child molestation."); *United States v. Williams*, 529 F.3d 1, 6 (1st Cir. 2008) ("consent is not a defense to a prosecution under section 2423(a)"); *United States v. Abad*, 350 F.3d 793, 798 (8th Cir.

2003) ("The consent or willing participation of the 13-year old girl is insignificant and hardly relevant. '[W]hen sexual assaults are committed upon children . . . , consent is not a defense. The reason is that the victims in these cases, because of ignorance or deceit, do not understand what is happening to them. Therefore their 'consent' is of no significance."). In fact, Congress enacted the Mann Act to criminalize precisely the fact pattern where a victim consents to the sexual conduct. *See United States v. Bennett*, 258 F. App'x 671, 683 (5th Cir. 2007) ("[C]onsent is irrelevant to a conviction under § 2423(a). Indeed, the very purpose for enactment of the Mann Act was to address situations where the victim consented to the exploitation."). The Court previously ruled consistent with this case law with respect to the Weingartens' co-defendants. (*See* Helbrans MIL Opinion at 61). Similarly, the Victims' supposed consent to be kidnapped is irrelevant, as consent is not a valid defense under § 1204. The defendants should therefore be precluded from arguing that the Victims' consent serves as a defense to the charged crimes.

- **The Court should preclude the Defendants from arguing that the family court order was fraudulently obtained.**

  The Court should once again preclude any arguments centered on the validity of the family court order and the process by which it was obtained prior to the kidnapping. (*See* Helbrans MIL Opinion at 58 ("In sum, any arguments about the process by which the Family Court Order was obtained or the terms of the Family Court Order are irrelevant to whether Defendants intended to obstruct the Mother's exercise of parental rights, which clearly existed at least pursuant to the Family Court Order, and would only serve to confuse the issues, and mislead the jury." (internal quotation marks and brackets omitted); Malkas MIL Opinion at 33); *see also United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 2873800, at *11 (S.D.N.Y. July 8, 2021) (noting that "Defendants' contention that the Kings County Family Court should not have granted sole custody to the Mother did not entitle them to disobey it"); *see also United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010) (affirming district court's exclusion of certain evidence proffered by IPKCA defendant because there was no evidence that the operative custody order in effect at the time of the alleged kidnapping was ever appealed or stayed and therefore, at the time defendant took the child, defendant was "required to comply with the Vermont court order which gave [the other parent] lawful parental rights to full custody, rights [the defendant] frustrated by keeping [the child] outside the United States"); *see also McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("An order issued by a court must be obeyed, even if it is later shown to be erroneous."). Thus, any arguments centered on the process by which the court order was obtained are irrelevant and would only serve to "confus[e] the issues, [and] mislead[] the jury." F.R.E. 403.

IV. **The Court Should Admit Into Evidence Certain Business Records on the Basis of Written Declarations of the Relevant Custodian of Records, Pursuant to Federal Rules of Evidence 803(6) and 902(11)**

During its case-in-chief at trial, the Government expects to introduce business records (the "Business Records") from several entities, including United Airlines, Google, Walmart, Super 8 Motel, and Westchester County Jail. In addition, the Government anticipates introducing video footage from several locations. To help streamline the trial, on January 2, 2024, the Government inquired (through standby counsel) as to whether the Defendants intend to contest the authenticity and business-records-nature of these materials, and if not, whether the Defendants would be amenable to stipulations for their authenticity. The Government requested a response through stand-by counsel by January 4, 2024. Shmiel has confirmed through his standby counsel that he is not amenable to stipulations, and no other response has been received as of the date of this filing.

A finding by the Court that certain business records may be introduced pursuant to written certification under Rule 902(11) will obviate the need for significant inconvenience and expenditure of time by third parties who would otherwise need to testify at trial. Moreover, a finding by the Court that business records may be introduced pursuant to written certification would meaningfully streamline the Government's presentation of evidence, serving the ends of judicial economy and taking into consideration the time and attention of the jury. Rule 902(11) exists for precisely this reason.

### A.    Applicable Law

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court found that out-of-court statements that are "testimonial" violate the Confrontation Clause of the Sixth Amendment and are inadmissible unless the declarant is unavailable, and the defendant has had prior opportunity to cross-examine the declarant regarding the statement. However, under Federal Rule of Evidence 104(a), preliminary determinations concerning the admissibility of evidence are made by the district court, and in making such determinations, the district court is not bound by the rules of

evidence. Accordingly, a judge's use of hearsay evidence to decide a preliminary question of admissibility under Rule 104(a) does not implicate the Confrontation Clause. *See United States v. Matlock*, 415 U.S. 164, 174-75 (1974) (upholding the use of hearsay testimony at a suppression hearing); *Bourjaily v. United States*, 483 U.S. 171, 178 (1987) (upholding use of hearsay in determination of admissibility of coconspirator statements); *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982) (endorsing use of hearsay evidence under Rule 104(a)). As such, the Confrontation Clause is not implicated when certifications seeking to authenticate business records under Rule 902(11) are presented to the Court for the purpose of an admissibility determination under Federal Rule of Evidence 104 and not admitted into evidence. *See United States v. Qualls*, 53 F. Supp. 2d 241, 245 (E.D.N.Y. 2008), *aff'd summary order*, 613 Fed. Appx. 25 (2d Cir. 2015) (finding that certifications that were not in evidence present no Confrontation Clause issue).

Moreover, even if the certifications themselves were admitted as evidence, the Second Circuit has held that business records properly admitted under Federal Rule of Evidence 803(6) "cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." *United States v. Feliz*, 467 F.3d 227, 233-34 (2d Cir. 2006); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (statements are "testimonial" if their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution").

Under Rule 803(6), a record may be admitted as non-hearsay if it was made at or near the time by someone with knowledge, or who had the information transmitted to them by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; and making the record was a regular practice of that business activity. Fed. R. Evid. 803(6). "The principal precondition to admission of documents as business records pursuant

to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994) (internal quotation marks omitted). The Second Circuit has taken a "generous view of the business records exception, construing it to favor [] the admission of evidence . . . if it has any probative value at all." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal citations omitted).

Business records of regularly conducted activity that meet the necessary conditions to qualify under the hearsay exception may be authenticated, among other methods, by a certification that complies with Rule 902(11). Fed. R. Evid. 803(6)(D); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Prior to trial, the proponent of the records must also give the adverse party reasonable written notice of the intent to offer the records and make the records and certifications available for inspection so that the adverse party has a fair opportunity to challenge them. *Id.*

Just as properly admitted business records are not considered testimonial, so too a certificate required under Rule 902(11) to authenticate such records is not considered testimonial. In *United States v. Qualls*, 53 F. Supp. 2d 241, 245 (E.D.N.Y. 2008), *aff'd summary order*, 613 Fed. Appx. 25 (2d Cir. 2015), the court held that authentication of foreign business records pursuant to Section 3505 did not violate the Confrontation Clause of the Sixth Amendment. In so holding, the court reasoned that prohibiting the admission of records necessary to authenticate the business records themselves would be contrary to the Supreme Court's intention to support the

admission of business records as nontestimonial. *Id.* at 246. The court further observed that judicial economy would be reduced with little gain to the truth seeking process if these business records had to be authenticated by live witness testimony. *Id.*

While the Second Circuit's summary order affirming the decision in *Qualls* did not explicitly reach the question of whether a certificate authenticating business records could itself be considered testimonial, all other circuits that have addressed the question have held that it is not. *See United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir. 2011) (certificate of authenticity presented under Rule 902(11) is not testimonial); *United States v. Anekwu*, 695 F.3d 967, 077 (9th Cir. 2012) (not plain error for district court to admit business records authenticated by certificate where the purpose of the certificate was merely to authenticate the records and not to establish or prove a fact at trial); *United States v. Adefehinti*, 510 F.3d 319, 327-38 (D.C. Cir. 2008) (authentication of hundreds of loan applications, sales contracts, promissory notes, verifications of deposit and of employment by way of 902(11) certifications by numerous custodians of record is permissible under *Crawford*); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (written certification attesting to authenticity of business record is not testimonial evidence); *see also United States v. Al-Imam*, 382 F. Supp. 3d 51, 59-60 (D.D.C. 2019) ("Every court that has addressed this issue has concluded that admission of certifications pursuant to Rule 803(6)—including § 3505 and its analogs in Rule 902(11) and (12)—does not pose Confrontation Clause problems" and gathering cases); *United States v. Varone*, No. 08 Cr. 184, 2008 WL 11352621, at *1 (N.D. Ohio Dec. 4, 2008) ("The certificates of authenticity, in this case, do not purport to convey any information about Defendant, but merely establish the foundational elements necessary to create a business record."); *United States v. Bryant*, No. 04 Cr. 47, 2006 WL 1700107, at *4 (W.D. Va. June 15, 2006) (a "business record certification . . . does not serve

independently as evidence in[a] case; rather, it serves merely to lay a foundation for the admission of business records"); *cf. United States v. Jimenez*, 513 F.3d 62, 77-80 (3d Cir. 2008) (holding that admission of bank records certificated under 902(11) was harmless error).

Furthermore, as the Second Circuit has recognized, "[a] business record may include data stored electronically . . . and later printed out for trial so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp*, 38 F.3d at 632 (alterations omitted). The Second Circuit has, accordingly, affirmed the admission of information drawn from such electronic databases for purposes of trial. *United States v. D'Agostino*, 638 Fed. Appx. 51, 55 (2d Cir. 2016) (IRS account transcripts that "merely decode information that IRS agents previously entered into" IRS database properly admitted as business records); *United States v. Bonomolo*, 566 Fed. Appx. 71, 73-74 (2d Cir. 2014) (spreadsheet of data compiled as ordinary part of business was admissible as a business record); *see also United States v. Warner*, 638 Fed. Appx. 961 (11th Cir. 2016) (affirming admission of spreadsheets summarizing fraudulent tax returns allegedly submitted by defendant); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.") (internal citations omitted). Other courts have likewise admitted reports generated by querying bank databases containing a "compilation of data" maintained in the ordinary course of business. *See, e.g.*, *United States v. Battles*, 514 Fed. Appx. 242, 249 (3d Cir. 2013) (spreadsheet that "depicted a small portion of the [bank] database" was admissible business record despite fact "[t]hat the spreadsheet excerpt was created for the purpose of litigation"); *United States v. Glasser*, 773 F.2d 1553, 1558-59 (11th Cir. 1985) (computer printouts containing compilations of various mortgage account

transactions that were basis of prosecution were admissible under business records exception); *Remington Inv., Inc. v. Quintero & Martinez Co.*, 961 F. Supp. 344, 351 (D.P.R. 1997) (admitting FDIC report that was "compilation of data from 'matters observed,' namely, the business records of the Bank").

## B. Discussion

The Court should admit the Business Records pursuant to written certifications under Rule 902(11).[9]   A proper foundation for admission of the records will be established by the certificate of the relevant records custodian.  *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *3 (S.D.N.Y. Feb. 14, 2021) (admitting several types of records pursuant to Rule 902(11) because "[d]efendants offer no specific reason to doubt the self-authenticability"); *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 141 (S.D.N.Y. 2015) (admitting emails as business records where custodian of records for non-party certified that they met all criteria and opposing party had not shown indicia of lack of trustworthiness); *see also* 5 Weinstein's Federal Evidence, § 803.08[8][b], at 803–82 ("Instead of providing live testimony from a custodian or other qualified witness, the proponent of business records may choose to present the foundation by a certification that complies with Rule 902(11) . . . .") (emphasis added). These certifications are properly considered by the Court pursuant to Rule 104(a) and will not be admitted at trial.

While the admissibility of the specific records will, of course, be subject to the Court's determination at trial as to relevance, the certifications will obviate the need for significant inconvenience and expenditure of time by third parties in order to authenticate the records.   The

---

[9] This letter, along with those certifications, serves as "notice of the intent to offer" the relevant records, and an opportunity to inspect them, "so that the [adverse] party has a fair opportunity to challenge them."  Fed. R. Evid. 902(11).

Business Records at issue here are standard records obtained from third-party institutions pursuant to legal process during the Government's investigation. The entities that produced the records—including United Airlines, Google, Walmart, Super 8 Motel, and Westchester County Jail—have previously provided the Government with certifications meeting the requirements of Rule 902(11). The Government thus respectfully requests that the Court rule that the Government may introduce at trial the business records discussed above pursuant to Federal Rules of Evidence 803(6) and 902(11).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant its motions *in limine* and admit the above-described evidence at trial.

Dated: January 5, 2024
    White Plains, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    ____/s/_____
    Sam Adelsberg
    Jamie Bagliebter
    Jim Ligtenberg
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2494