

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

July 2, 2024

**BY ECF**
The Honorable Nelson S. Román
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re: *United States* v. *Yakov Weingarten, Shmiel Weingarten and Yoil Weingarten*, S3
       **19 Cr. 497 (NSR)**

Dear Judge Román:

The Government respectfully submits this letter in advance of the sentencing of Yakov Weingarten, Shmiel Weingarten, and Yoil Weingarten (collectively, the "Weingartens" or the "defendants").[1]  The defendants are scheduled to be sentenced on July 9, 2024 for their offenses in this case: namely, (i) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); (ii) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); (iii) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses to the secure area of an airport, in violation of 18 U.S.C. § 371; and (iv) two counts of international parental kidnapping, in violation of 18 U.S.C. § 1204.  Yakov Weingarten is also being sentenced for one count of attempted international parental kidnapping, in violation of 18 U.S.C. § 1204. The Government writes in advance of sentencing and in response to the defendants' objections to the Presentence Investigation Report ("PSR") dated June 11, 2024 (Dkt. No. 1039, "Defs. Objections").

As detailed herein, the defendants' criminal conduct is deeply troubling and merits a substantial sentence.  The Weingartens and their co-conspirators kidnapped two children from New York in the middle of the night, provided them disguises, and brought them to a nearby airport where, using fake identities, the minors were smuggled to Mexico.  The purposes of the kidnapping were clear: to return the kids to Lev Tahor—where they, along with a select few other individuals, ruled with an iron first—and to re-unite one of the children, a 14-year-old girl, with her adult husband so that they would resume their illegal sexual relationship.  And unlike their co-

_____

[1] Because so much of the defendants' conduct is overlapping, the Government is submitting its position on sentencing as to all three defendants in one memorandum. The Government of course understands that the Court will conduct an individualized assessment of each defendant in fashioning an appropriate sentence and has endeavored to highlight the distinctions among the defendants where applicable.

defendants, Nachman Helbrans and Mayer Rosner, who were previously sentenced by the Court to twelve years' imprisonment, these defendants also committed obstruction of justice. Defendants Yakov and Shmiel Weingarten also committed perjury.

As discussed further below, the Guidelines Range for each of the Weingartens is 360 months' imprisonment to life imprisonment. However, as noted above, two of the Weingartens' similarly situated co-defendants were sentenced to twelve years' imprisonment. Because Guidelines sentences for the Weingartens would inaccurately reflect the co-conspirators' relative culpability by imposing a significantly greater sentence on the Weingartens than Helbrans and Rosner, **the Government instead respectfully submits that sentences meaningfully greater than twelve years are fair and appropriate sentences for each of the Weingartens because it would address the relevant Section 3553(a) factors and also account for the Weingartens' obstructionist conduct.**

A.     **Background**

1.     **2017 – Early 2018: Helbrans Assumes Control of Lev Tahor and Rosner Serves as Senior Leader of the Group**

Along with several of their co-defendants, the Weingartens were leaders of an ultra-Orthodox Jewish sect called Lev Tahor. (PSR ¶¶ 16, 19, Trial Tr. 337, 1452). The sect was founded in the 1980s by Helbrans' father, Shlomo Helbrans, who led the group until his death in 2017. (PSR ¶ 16). After Shlomo Helbrans' death, Helbrans took over as Lev Tahor's leader. (*Id.*). Helbrans, Rosner, and the Weingartens were known within the community as the "Hanhala," or management, of Lev Tahor. (*Id.*). Helbrans established the rules for the community and, together with the Hanhala, managed the operational affairs of the community. (*Id.*). These community rules covered every aspect of the lives of Lev Tahor's adherents, including their studies, their daily schedules, their interactions with family members and other members of Lev Tahor, their interactions with individuals outside of Lev Tahor, and their diets. (*Id.*).

In particular, Helbrans and other members of the Hanhala assumed total control over marriage and sex in the community. They decided who got married and when. (*Id.* ¶ 17). They also had a practice of marrying off girls as young as 12 years old, often to adult men. (*Id.*). Underage weddings were often conducted in secret to hide the ages of brides. (*Id.*). The Hanhala played prominent roles in these weddings of underage girls—for example, Helbrans often officiated the wedding and Mayer Rosner sang to celebrate the couples. (*Id.*). Yoil Weingarten and Yakov Weingarten advised men who were about to marry underage girls regarding how to have sex with the child brides. (Trial Tr. 702-05, 1412-13).

Married couples living within Lev Tahor—including those involving minors—were required to have sex. (*Id.* ¶ 18). The Hanhala controlled when and how young brides had sex. (*Id.*). They prescribed the days of the week and month that couples were required to have sex, what sexual positions they were permitted to use, and what they should wear during sex. (*Id.*). They also kept track of teenage girls' menstrual cycles and encouraged adult grooms to use alcohol and erectile disfunction drugs to have sex with them. (*Id.*). Helbrans also ordered pregnant women to give birth in their tents to hide that child brides were required to have sex. (*Id.*; Trial Tr. 669). Helbrans and Rosner also ensured that members of Lev Tahor knew that disobeying the Hanhala's commands when it came to marriage and sex could result in serious punishment, such as having

children removed from the home or being forbidden to speak with family. (PSR ¶ 16). The leaders regularly separated children from their families and husbands from their wives for minor infractions. (*Id.*).

In early 2018, Helbrans and Rosner required a 13-year-old girl ("Jane Doe") to religiously marry Rosner's son, Jacob Rosner ("Jacob"), who was 19-years-old at the time of the wedding. (*Id.* ¶ 20). Jane is Helbrans's niece. (*Id.*). Jane and Jacob were not legally married, as marriage of a 13-year-old is illegal in Guatemala. (*Id.*). Jane's mother, Sara Helbrans (Nachman Helbrans's sister), objected to Jane's wedding but was unable to stop it from occurring. (*Id.*). As a married couple, Jane and Jacob were required to have sex, and they did, in fact, have sex. (*Id.*). They had sex for the first time the day after their wedding and then regularly thereafter as mandated by the Hanhala. (*Id.*).

## 2. Early 2018 ─ November 2018: Jane Doe's Mother Escapes Lev Tahor and Jane Is Brought to New York

Following Jane's wedding, Sara's relationship with Helbrans and the rest of the Lev Tahor leadership became strained. (*Id.* ¶ 21). As a result, Sara was punished. (*Id.*). Helbrans, Rosner and the other members of the Hanhala removed Sara's children and husband from her home. (*Id.*). They also banned every member of Lev Tahor from talking to her, except for the Hanhala and two women, one of which was Mayer Rosner's wife. (*Id.*). Ultimately, Sara decided to leave Lev Tahor as a result. (*Id.*). Initially, she took three of her children with her to New York when she left, but was unable to take her other three children, including Jane. (*Id.*). After Sara left Lev Tahor, members of the Hanhala instructed Jane on what steps to take if she was removed from Lev Tahor. (*Id.*). They instructed her that if anyone asked her, she should lie and say that her mother, Sara, beat her. (*Id.*; Trial Tr. 2099-2100). Jane was also instructed to call certain people, including Shmiel Weingarten and Yoil Weingarten, if she was removed from Lev Tahor. (Trial Tr. 1887).

A short time after Sara left Lev Tahor, Jane's father, who is also leader in Lev Tahor, took Jane and her other siblings who were still in Guatemala to Mexico in an effort to fraudulently obtain passports for the children. (*Id.* ¶ 22). As a result, Jane, her then-12-year old brother ("John Doe"), and a third sibling were taken by law enforcement and reunited with their mother, Sara, in New York. (*Id.*). After Jane was taken to New York, one of the first people she contacted was Yoil. (*Id.*; Trial Tr. 2014). They spoke by phone while Yoil was in Mexico City. During this time Yakov told Abe Grunhut to stay away from Jane because Grunhut was preventing Jane from going back to her husband and community. (PSR ¶ 22; Trial Tr. 1893). Yakov said that Jane belongs with her husband. (*Id.*).

On November 14, 2018, Sara obtained a court order from Kings County Family Court granting her custody of all six of her children, including Jane Doe and John Doe. (PSR ¶ 23). Sara also obtained a protective order that prevented the father of the children from communicating with the children. (*Id.*). The Weingartens—along with the rest of Lev Tahor's leadership—were aware of these orders. (*Id.*).

**3.      November 2018 ─ December 2018: The Hanhala Develops a Plan to Kidnap Jane and John Doe and Sets in Motion Preparations for the Kidnapping.**

The Weingartens and their co-conspirators then devised a plan to kidnap Jane and John to bring them back to the Lev Tahor community, and specifically to reunite Jane with her husband, Jacob, to enable Jane to continue having sex with Jacob.  (*Id.* ¶ 25; Trial Tr. 423-24).  The Weingartens all played a central role in kidnapping Jane and John Doe and directing others within the group to execute on that plan and ensure its success. (PSR ¶ 25).

At the Hanhala's direction, several members of the group—Shmiel Weingarten, Jacob Rosner, Aron Rosner, Mordechay Malka and Shimon Malka—met in Brooklyn, New York on December 5, 2018.  (*Id.* ¶ 26).  At this time, Nachman Helbrans and Mayer Rosner were in Mexico together and were in communication with the other co-conspirators.  (*Id.*).  Shmiel Weingarten stated during the meeting that Nachman Helbrans instructed them to take an oath of silence on a religious article to promise to never talk about the kidnapping to anyone again.  (*Id.*).  During this meeting, Shmiel Weingarten also told Shimon Malka that if he helped with the kidnapping, Nachman Helbrans would pray for Malka and that his past—namely, his decision to leave Lev Tahor—would be forgiven.  (*Id.*).  Malka understood this to mean that he would be re-united with his wife, who had been forbidden by the Hanhala from talking to Malka since he left the community two months earlier.  (*Id.*).  It was also made clear to Malka that the person in control of whether he would talk to his wife again was Yakov.  (*Id.*)  The group also received burner phones and aliases and were instructed to only use an encrypted application to communicate.  (*Id.*).  In addition, during this meeting, Shmiel Weingarten called Mayer Rosner and discussed the kidnapping plan with him.  (*Id.* ¶ 27).

The following morning, on December 6, 2018, Shmiel Weingarten, Jacob Rosner, and Mordechay Malka went to Walmart to buy disguises for the kidnapping.  (*Id.* ¶ 28).  They bought secular clothing for the kids, for themselves, and for Nachman.  (*Id.*).  The purpose of the disguises was to make it more difficult for law enforcement to identify the children and the kidnappers during the kidnapping.  (*Id.*).  Later that day, Mordechay Malka rented a silver Nissan Rogue to use as the get-away car for the kidnapping.  (*Id.*).  That evening, Shimon Malka, Shmiel Weingarten, Mordechay Malka, and Jacob Rosner met again.  At this meeting, Shmiel told the others that someone nicknamed "Mishul" would come to transport the kids on flights to the border of Mexico, where they would then cross over by land.  (*Id.*).  As with the prior meeting, during this meeting Shmiel Weingarten called Mayer Rosner to discuss the kidnapping.  (*Id.*).  The plan was to take Jane and John from a Hanukah celebration that was planned to occur the following day in Woodridge, New York.  (*Id.*).  After the meeting, Shimon Malka delivered a cellphone to Jane to enable her to communicate with the kidnappers.  (*Id.*).  Jane was aware that the kidnappers were making efforts to take her back to Lev Tahor and she intended to go with them.  (*Id.*).

The following day—Friday, December 7—Sara and her kids travelled from Brooklyn up to Woodridge, New York to attend a holiday celebration at a family friend's home that was scheduled to occur from Friday evening through Saturday evening.  (*Id.* ¶ 29).  Shimon Malka was also attending the celebration, and part of the kidnapping plan was for him to help get Jane and John out of the house when the other kidnappers came to pick them up.  (*Id.*).  The same day, Nachman drove from Philadelphia to Woodridge and met up with Shmiel Weingarten and

Mordechay Malka at a motel that was near the house where Sara and her children were staying. (*Id.*).

### 4.    December 2018: Helbrans Kidnaps Jane and John Doe and Flees With the Children to Mexico

Sometime between 2 AM and 3 AM on the morning of December 8, Shimon Malka learned from Shmiel Weingarten that it was time for him to wake up John. (*Id.* ¶ 30). At 2:56 AM on December 8, Jane and John walked outside of the house to the getaway car, the Nissan Rogue rented by Mordechay Malka. (*Id.*). Helbrans, Shmiel Weingarten, and Mordechay Malka were waiting in the car. (*Id.*).

Jane and John were then driven to the motel where they changed into the disguises that the kidnappers had purchased for them at Walmart. (*Id.* ¶ 31). From there, the group drove to Scranton International Airport. (*Id.*). Once at Scranton airport, Helbrans used airplane tickets that were in his own children' names as documentation for Jane and John. (*Id.* ¶ 32). Helbrans, Jane, and John went through security. (*Id.*). Jane and John were instructed by Helbrans to provide airport security with his own children's names when asked to identify themselves. (*Id.*). Using these fake names, Jane and John passed through security and boarded the flight with Helbrans. (*Id.*). They then took three domestic flights before landing in San Antonio and then driving across the border to Mexico.

Once in Mexico, Nachman Helbrans took Jane and John to a hotel in Mexico City called Hotel Cozumel. (*Id.* ¶ 33). Mayer Rosner, Jacob Rosner (Jane's husband), and Yoil Weingarten and other members of Lev Tahor met them at the hotel shortly thereafter. (*Id.*). Soon afterward, the group traveled to a house in the country in Mexico where they stayed until December 18, 2018, when Mexican law enforcement raided the home and arrested Nachman, Mayer, and Jacob. (*Id.* ¶ 39). During the raid, Jane and John hid in the closet in the house and were not found by Mexican law enforcement. (*Id.* ¶ 39).

After the raid, Yoil and Shmiel came and retrieved Jane and John. (*Id.* ¶ 40). During this time, Shmiel and Yoil had Jane and John wear dark makeup to hide from authorities, and they wore dark makeup as well. (*Id.*). During the time that Jane and John were held in Mexico, all of the Weingartens had telephone communications with Shimon Malka telling him not to speak with law enforcement. (*Id.*). In one call, Yakov instructed Shimon Malka to get out of the United States immediately. (*Id.*). During this time, Shmiel also had calls with Yakov, connected through Aron Rosner, in which he asked Yakov for credit cards of Lev Tahor members so that he and Yoil could continue to move around with Jane and John without being tracked or caught. (*Id.*).

Law enforcement located the children shortly thereafter and recovered them on December 27, 2018, with Yoil and Shmiel Weingarten. (*Id.* ¶ 41). Jane and John were then reunited with their mother and brought back to Brooklyn. (*Id.*).

### 5.    March 2019: Yakov, Helbrans and Others Attempt to Kidnap Jane Again

In March 2019, Helbrans and Yakov tried again to kidnap Jane. (*Id.* ¶ 42). Helbrans, who was at the time detained at Westchester County Jail awaiting trial on charges related to the kidnapping, worked with Yakov and Matityau Malka, to once again kidnap Jane. Matityau Malka, who visited Helbrans several times at Westchester County Jail in March 2019, acted as an operative

in the plan. (*Id.*). In addition to visiting Helbrans, Matityau Malka was in near constant telephone contact with his co-conspirator, Yakov, during the relevant period. Multiple Lev Tahor operatives, including Matityau Malka, brought phones to Jane in an effort to facilitate her communication with members of the Hanhala about a plan to kidnap her again. (*Id.*). In addition, at Yakov's direction, a member of Lev Tahor brought Jane prescription pills that were sedatives with hypnotic qualities because she expressed that she was nervous about the plan. (*Id.*). When Sara Helbrans learned what was happening, she started speaking directly with Yakov and Helbrans. (*Id.*). On those calls, Helbrans and Yakov threatened that they would take her children and Yakov told Sara Helbrans that they would fight her until "the last drop of blood." (*Id.*). Yakov also tried to enable the kidnapping of John by asking him the name of the synagogue where he prays and by trying to send a foot solider there. (*Id.*).

## B.    Procedural History

As relevant here, Superseding Indictment S3 19 Cr. 497 (NSR) (the "Indictment") was filed on September 28, 2021, charging Yakov, Yoil and Shmiel with (i) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); (ii) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); (iii) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses to any secure area of any airport, in violation of 18 U.S.C. § 371; and (iv) two counts of international parental kidnapping, in violation of 18 U.S.C. § 1204. Yakov Weingarten was also charged with an additional count of attempted international parental kidnapping, in violation of 18 U.S.C. § 1204, in connection with the March 2019 attempted kidnapping of Jane Doe.

Trial began on February 29, 2024, and, on March 27, 2024, the jury returned a guilty verdict as to all counts in the Indictment. The defendants have been remanded since their arrests and extradition to the United States.

The Weingartens are the last three defendants to be sentenced in this case. Helbrans, who was charged in the same six counts as Yakov, was sentenced to 144 months' imprisonment and five years' supervised release. Mayer Rosner, who was charged in the same five counts as Shmiel and Yoil, was also sentenced to 144 months' imprisonment and five years' supervised release.

### 1.    The Probation Department's Report and Recommendation

The Probation Office issued Presentence Reports for each of the defendants. The Probation Office calculated a total offense level of 42 for each defendant. This offense level is two points higher than the offense level calculated by the Probation Office and adopted by the Court in the sentencings of Nachman Helbrans and Mayer Rosner because, unlike Helbrans and Rosner, the Weingartens were assigned two additional points based on their obstruction of justice. Accordingly, the Probation Office's calculation for the Weingartens is as follows:

- Counts One through Four were grouped together for Shmiel and Yoil and Counts One through Four and Six were group together for Yakov (the "Group") with a base offense level of 28, pursuant to U.S.S.G. § 2G1.3(a)(3). (PSR ¶ 56).[2]
- The offense level was increased by two levels, pursuant to U.S.S.G. § 2G1.3(b)(1)(A), because the defendant is a relative of the minor victim. (PSR ¶ 59).
- The offense level was increased by two more levels, pursuant to U.S.S.G. § 2G1.3(b)(2)(B), because the defendant unduly influenced a minor to engage in prohibited sexual conduct. (PSR ¶ 60).
- The offense level was increased by two additional levels, pursuant to U.S.S.G. § 3A1.1(b)(1), because the victims were unusually vulnerable after their unique upbringing in the Lev Tahor community. (PSR ¶ 61).
- Another two levels were added, pursuant to U.S.S.G. § 3B1.4, because the defendant used the minor victims to commit the offense. (PSR ¶ 63).
- The offense level was increased by four more levels, pursuant to U.S.S.G. § 3B1.1(a), because the defendant was a leader of the criminal conspiracy involving five or more participants. (PSR ¶ 62).
- The offense level was increased by two levels because, pursuant to U.S.S.G. § 3C1.1, the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice.
- Given that this Group resulted in the greater of the adjusted offense levels, the offense level was set at 42. (PSR ¶¶ 73-76).

Since the Weingartens have no criminal history, the Probation Office rendered a Guidelines range of 360 months to life imprisonment, to be followed by five years' supervised release. The Government agrees with the Probation Office's calculation.

The Probation Office recommended a sentence of 189 months' imprisonment for each of the three defendants.

**C. The Defendants Objections to the PSR**

The defendants filed a letter outlining their objections to the PSR. (Dkt. No. 1039). This includes objections to the following: (1) the application of the enhancement of obstruction of justice (Def. Objections at 3-7)[3]; (2) the application of the enhancement for being a relative to the

---

[2] Citations to the PSR refer to the Presentence Report prepared for Yakov Weingarten, which substantially overlaps with the Presentence Reports prepared for Shmiel and Yoil Weingarten.

[3] Page numbers refer to the pagination in the PDF document filed on ECF.

victim (Def. Objections at 7-8, 12-14); and (3) the application of the enhancement for targeting a vulnerable victim (Def. Objections at 8-9).[4]  The Government responds to each in turn.

### 1.    The Obstruction of Justice Enhancement Should Be Applied

The two-level enhancement for obstruction of justice should be applied to all three defendants based on their obstructionist conduct and efforts to improperly influence witness testimony.  In addition, the enhancement is appropriate for Yakov and Shmiel because they perjured themselves when they testified.

*First*, in the weeks, months and years leading up to the Weingartens' trial, the Weingartens worked with others to put false information before the Court.  The most striking example was the testimony and false affidavit submitted by defense witness Chaim Malka.  The Weingartens, who consistently presented a joint defense, elicited testimony from Chaim Malka that he accidentally delivered his own sleeping pills to Jane Doe when they were left loose in a bag full of cellphones that he was delivering to Jane and John while in communication with Yakov and Nachman Helbrans. (Trial Tr. 2642).  This testimony was demonstrably false.  Jane Doe testified that Yakov told her he would send her something for her anxiety and understood the pills to have been provided for that reason (Trial Tr. 2122), and Chaim Malka's prescriptions reflected they were for 3 milligrams of Doxepin, not the 10 milligram pills provided to Jane Doe (*see, e.g.*, GX 801).  Nonetheless, the Weingartens had Chaim Malka travel from Guatemala to New York for the express purpose of providing this fictious narrative to the jury.  The defendants' willingness to present false information to the Court and jury was further demonstrated when it was revealed that a 64-page sham affidavit purporting to be from this witness had previously been submitted to the Court.  (Trial Tr. 2651-2655, 2699-2700).  While on the stand, Chaim Malka expressly denied drafting this affidavit.  (*Id.*).  As noted by the Court during trial, this was not the only example of documents filed in this case that later appeared not to be written by the purported author and/or to have been heavily influenced by the defendants.  The Court will also remember the testimony of defense witness Jose David Rosales Figueroa during which he appeared to have no recollection of a 21-page article purportedly authored by him called "The Chronicles of Lev Tahor," despite such a written text being far outside his usual area of expertise and academic literature—dermatology. (Trial Tr. 1741-1746).

*Second*, the Weingartens worked through intermediaries to attempt to improperly influence the testimony of possible Government witnesses.  The Weingartens are permitted to contact and speak with the Government and defense witnesses alike, and the Government does not argue otherwise.  However, the Government has obtained evidence reflecting that the Weingartens went far beyond this.  Indeed, using intermediaries, including Mordechay Malka, Chayeh Weingarten, and Jacob Rosner, the Weingartens sought to get messages to Government witnesses that they

---

[4] The Weingartens also object generally to the full recitation of the offense conduct claiming that it is "false or completely taken out from their context."  (Def. Objections at 2).  This general objection does not provide the Government—or the Court—with any semblance of which factual issues the Weingartens dispute.  Moreover, the Court presided over the trial and is well-aware of the facts.  Accordingly, the Court should adopt the Government's factual summary, which is fully consistent with the evidence and testimony presented at trial in this case.

knew they could not communicate with directly.  Some of the evidence that the Government obtained reflecting this includes the following:

- An email account purporting to belong to Jane Doe (the "Email Account") that was used to fire her prior counsel and search for new counsel appears to have been used by co-defendant Jacob Rosner, and was in close communication with Chayeh Weingarten (the Weingartens' sister) and Mordechay Malka, another co-defendant.  The recovery email address on the Email Account was JacobRosner828@gmail.com and the phone number associated with the account was a number used by Jacob Rosner.  The Email Account did not include any indicia of being used by Jane Doe.  Instead, during 2024, it almost entirely consists of emails to potential counsel, notifications from support@pacermonitor.com (an email address associated with website that assists in tracking federal cases).  At least one of the emails from support@pacermonitor.com is sent to both the Email Account and malkamordechay@gmail.com, which appears to be an email account of Mordechay Malka. The emails from PACER are notable because Mordechay Malka informed Yakev on a recorded jail call on February 15, 2023 that "someone already made an account on PACER this week" and stated that "they're keeping an eye on everything."  When the Email Account communicated with potential new counsel, Chayeh Weingarten was often copied on those emails, as well as emails appearing to belong to Mordechay Malka and Jacob Rosner.

- A recorded phone call on February 15, 2024 between Yakov and Mordechay Malka reveals them discussing Jane Doe's and Jacob Rosner's appearance at the final pretrial conference earlier that same day.  On that call, Yakov told Mordechay Malka what an "incredible thing" it was when Jane Doe and Jacob Rosner walked into the Courtroom "right on time," which was as the defendants were arguing that Jane Doe should not be permitted to use a pseudonym.  Shortly thereafter, Mordechay Malka told Yakov: "Your lawyer got a note from somebody . . . someone gave a whole note.  He came with it in his hand . . . He waited until the end and later gave your Honor a note, an important note . . . A note that, that, that, [UI] you, it's the, the, the, the, the, the, the decision."  To this statement, Yakev Weingarten responded: "Oh, I understand, I understand.   Good, good, good, I understand."  Subsequently, the Weingartens provided the Government with a document that appears to be the note that, according to Malka's statements to Yakov Weingarten, Jacob Rosner handed to Yakov Weingarten's standby counsel after the final pretrial conference.  The typed note stated:

    > Dear lawyer,
    > I hereby would like to express my willingness regarding how to call me during the trial.  I want to be called with my legal name and not with a nickname.  If my former lawyer Ms. Moser requested that I be nicknamed during trial, I would like to advise you that she did not consult with me about it and strongly disagree to be called Jane Doe or any name other than my real name.  I do not want to be portrayed or treated like a sex victim because that Is not what I am. Please share a copy of this letter with your client.  And tell them that I pray for their release and a strong winning trial.

Thank you and good luck!
[Jane Doe's handwritten name]

- Recorded jail calls in which Yakev and Mordechay Malka discuss letters that Yakev wants Jane Doe to submit to the Court. For example, on February 15, 2024, Yakev spoke to Mordechay Malka about an "idea" that he described as "very simple." He said: "You take piece of paper, you write. If you don't have time to write it in English, you can write it in any language in the word, even in Chinese. Right?" Yakev and Mordechay Malka then spent several minutes discussing what would go in this written document. During the conversation they used coded language about a "school," "a principal," and "teachers." From the context of the conversation, it is apparent that they are discussing ways for Jane Doe to inform the Court and/or the Weingartens' standby counsel of certain things. For example, in the excerpt below, Yakev and Mordechay Malka discuss how Jane Doe should tell the Court that her lawyer has not been informing her of Court proceedings, including important proceedings related to co-defendants:

> **Yakev**: What's the idea? The idea is twofold. The idea is: firstly, to protest against the school, not protesting so to scare [UI] away, but to say so and so was the story. I was very hurt by this, and it was wrong.

> **Mordechay**: Eh, not only that, this is not the first time. Again, they, for instance, for instance, they announced, they announced to all the children when there would be school. And this boy, they discriminate only against this boy and they never tell him when there's school. And they make sure that he doesn't know so that he comes late [UI] not just today, the whole time since he turned three years old.

> **Yakev:** Wow, can they write that for me as well? Can they write that for me too? But it can't be, the most important thing is that it doesn't need to be professional. It doesn't have to be—

> [. . .]

> **Yakev**: Yes, I understand, yes, yes, yes. But the main thing is that it shouldn't be a professional thing. When you take it to a school it can be in any language. And you add: please, please, please, the school itself should try to figure out what it says… if we don't have time, if we don't—

> [. . .]

> **Yakev:** Yes. But today, but just, just, just a mitzvah note, if you give it to just any teacher, and I don't see what's going to come out of that. It's a nice thing, but I don't know if anything is going to result

from that. You know if you go to a teacher in a Pupa school, you give him a note about a school, a Vizhnitzer school, what can he do with that? He can't say it has to do with me, he can't say— what can he do with it?

**Mordechay:** Yes, that's what I was thinking, I was thinking—

**Yakev:** Maybe it'll be [UI] messenger

**Mordechay:** Yes, ok. Fine.

**Yakev:** Think about it, OK? I mean, you have to do, not think.

**Mordechay:** Yes.

**Yakev:** But, I'm saying you have to think before you do. OK?

**Mordechay:** OK.

At a different point in the call, Yakev gave Mordechay Malka instructions about how to get the letter written and provided to the Court: "And you go, and you write the letter even in Chinese. Right? If you don't have time for that. And you go over, you go over to the, to the, to the, you go over to the school and you give it to the school, to the office of the school."  Mordechay Malka responds to this directive by saying: "I understand."

Fourteen days after this phone conversation, the Government received an affidavit from Jane Doe's newly-retained counsel.  The affidavit, which the Court has referred to as a Manifesto (*see* Trial Tr. 515), purported to detail Jane Doe's allegations against the Court, the prosecutors, multiple FBI agents working on the case, her own lawyer, her social worker among others. Allegations discussed between Yakev and Mordechay Malka are reflected in the affidavit.

*Third*, as to Yakov and Shmiel, the enhancement should be applied because each defendant took the stand and repeatedly lied.  *See United States v. Stephens*, 369 F.3d 25, 27 (2d Cir. 2004) (finding that the district court correctly applied a two-level increase under Section 3C1.1 for obstruction of justice when the defendant's statements under oath were inconsistent with other evidence in the case). For example, Yakov denied being part of the Hanhala and denied having any role in decision-making within Lev Tahor; he said he had no role in planning meetings for the kidnapping; he testified that the phrase "fight you to the last drop of blood" was perfectly innocent and not a threat; he testified that the pills were delivered to Jane by mistake; he falsely denied that a judge in the Eastern District of New York made a finding that he had lied in a prior affidavit; he stated that he and has brothers did not receive new names in Lev Tahor and denied that his name was Abba Yakov Nuchem; he stated that Lev Tahor's interpretations of Jewish law never change; he pretended not to remember whether he had attended Jane and Jacob's wedding; he pretended not to know whether married girls were supposed to have sex; he said that trying to get Shimon to leave the U.S. had nothing to do with the kidnapping; he pretended that he called Jacob Jane's "boyfriend"—as opposed to "husband"—in an email to a lawyer for innocent reasons, not because

he was hiding anything; and he testified that Jane reported that her mom was abusing her. The evidence at trial plainly established that these were false statements.

Likewise, Shmiel was also evasive and repeatedly lied. For instance, Shmiel pretended not to know about Lev Tahor rules or whether husbands and wives were supposed to have sex; he pretended not to know whether having children was one purpose of marriage in Lev Tahor; he stated that Jane asked him to write the family court petition; he said Jane told him her mother had beaten her; he initially lied about whether he had called himself Jane's non-profit advisor in the family court petition; he initially denied that Ashley George told him he was not part of the case; he contradicted himself regarding whether the clothes they bought for the children were disguises; he stated that the children were not at a Hanukkah party before they were kidnapped; he stated that he was not wearing makeup in Mexico before his arrest; he said they did not use code names during the kidnapping; and he initially stated that no medical professionals were involved in Jane's care, then admitted that in fact they were. As with Yakov, the trial evidence makes clear that these were lies.

This record establishes by well beyond a preponderance of the evidence, that each of the defendants engaged in obstruction and that the enhancement is appropriate. *See United States v. Hernandez*, 83 F. 3d 582, 585 (2d Cir. 1996) (facts necessary to support an obstruction-of-justice enhancement need only be proven by a preponderance of the evidence).

### 2.    The Weingartens Acted as Relatives of Jane Doe

The Weingartens argue that the sentencing enhancement pursuant to U.S.S.G. § 2G1.3(b)(1)—which relates to Jane Doe being a "relative" or someone "otherwise in the custody, care, or supervisory control of the defendant"—should not be applied.  (Def. Objections at 7-8, 12-14.)  Yakov and Yoil argue that they are only related to Jane Doe through a marriage that is not recognized by the Court, and Shmiel claims to have no family relationship at all.  (*Id.*).  These arguments miss the mark, just as similar arguments were rejected by the Court when raised by Mayer Rosner in advance of his sentencing.

For starters, there is no doubt members of Lev Tahor considered Yakov and Yoil to be Jane Doe's cousin, and that similarly, Shmiel was viewed as someone with a level of supervisory control over Jane Doe.  In fact, at trial, the defendants explicitly sought to portray themselves as Jane Doe's relatives to portray the kidnapping as a family dispute. *See, e.g.*, Trial Tr. 45 ("Who is Yoil Weingarten? Jane's cousin. Who is Yakov Weingarten? Jane's cousin."); Trial Tr. 51, 1248, 3184, 3414; *see also* Trial Tr. 3091 (Shmiel disagreeing with statement that he had "no familial relationship" with Jane and noting his close ties to her "in the community"); Trial Tr. 3124-25 (similar).  The fact that the entire Lev Tahor community considered Jacob and Jane married—and that Yakov, Yoil and Shmiel used this familial relationship to further the kidnapping of Jane through communications with her immediately upon her leaving Lev Tahor—is sufficient to establish that Jane and Jacob were relatives for purposes of applying this enhancement.  Notably, the Court's prior conclusion that Jane and Jacob Rosner's marriage was not legally valid is not determinative in considering the application of the enhancement.  This is especially true in light of the Application Notes, which indicate that "[s]ubsection (b)(1) is intended to have broad application."  U.S.S.G. § 2G1.3(b)(1) cmt. n. 2.

In fact, the application could apply for all three defendants because they clearly fall within the meaning of the enhancement—namely, as someone who acted like a relative, and as someone otherwise in "supervisory control" of Jane. *See* U.S.S.G. § 2G1.3(b)(1)(B). That control is exhibited in the direct authority the Weingartens and the Hanhala exercised over Jane: dictating and controlling her sex life, where she would live, her interactions with her mother and law enforcement, and even her diet. Yoil and Shmiel were some of the first people in contact with Jane after she was brought to New York, and their aggressive efforts to insert themselves into her custody case (and their blatant attempts to control her during the litigation) demonstrate the extreme level of supervisory authority they asserted. Notably, in providing guidance for applying the enhancement, the Application Notes direct courts to "look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship." By looking to the "actual relationship" that existed between Jane and the Weingartens, the Government submits that application of this enhancement is clearly warranted for each of the three defendants.

### 3. Jane Doe Was a Vulnerable Victim

The Weingartens also argue that the vulnerable victim enhancement pursuant to U.S.S.G. § 2G1.3(b)(2)(B) should not apply. (Def. Objection at 8-9). As the Court has repeatedly found in the prior sentencings in this case, Jane Doe is undoubtedly a vulnerable victim. A "'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1) cmt. n. 2. Apart from her young age—Jane was 12 years old at the time of her engagement, 13 when she was religiously married to an adult, and 14 when she was kidnapped—Jane was raised to obey the Hanhala's every command at the risk of incurring severe punishments. Relatedly, Jane's fragile mental state was evident to the Court, years later, when it found—following a hearing—that Jane's diagnosis of post-traumatic stress disorder merited the remedy of having her testify via CCTV, pursuant to 18 U.S.C. § 3509. Put simply, Jane—by virtue of her age, her mental condition in light of her upbringing in the shadow of the Hanhala, and her unique vulnerability in the weeks after she was first removed from Lev Tahor—was a vulnerable victim preyed upon by the defendants and their co-conspirators to further the offense conduct.

\* \* \*

The Court should deny each of the defendant's objections to the enhancements. However, even if the Court found in favor of the defendants—which would be incorrect and inconsistent with the Court's prior rulings—the total offense level for the defendants would still be 37, resulting in a Guidelines Range of 210-262. In light of the 144-month sentences issued to Helbrans and Rosner, who are similarly situated to the defendants, the Government is seeking sentences below either Guidelines range, but substantially higher than the 12-year sentences imposed on Helbrans and Rosner, to account for the Weingartens' obstruction.

## D. Discussion

Significant sentences are necessary to reflect the seriousness of the offense and the history and characteristics of the defendants, to promote respect for the law, to protect the victims and others from future crimes of the defendants, and to deter the defendants and others. Accordingly, and as discussed more fully below, the Government asks the Court to impose sentences

meaningfully above the mandatory minimum of ten years, and sentences significantly greater than the 144-month terms of imprisonments imposed upon Nachman Helbrans and Mayer Rosner, as a result of the Weingartens' obstruction of justice.

### 1.    Applicable Law

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

### 2.    Sentences Meaningfully Above the Mandatory Minimum of 10 Years Are Fair and Appropriate in this Case for Each of the Three Defendants

The Court should sentence Yakov, Yoil and Shmiel Weingarten each to a sentence well above the ten-year mandatory minimum and far beyond the 144-month terms of imprisonments imposed upon their similarly situated co-defendants. The 18 U.S.C. § 3553(a) factors particularly applicable here include: (1) the need for the sentence to reflect the exceptional nature of the defendants' conduct and to provide just punishment; (2) the history and characteristics of the defendant; (3) the need to protect the victims and the public from future crimes of the defendant; (4) the need to deter the defendant and others; and (5) the need to promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A)-(C).

***First***, **the Court's sentences must reflect the exceptional nature of the defendants' criminal conduct and to provide just punishment.** The Weingartens and their co-conspirators orchestrated an audacious kidnapping of a 14-year-old girl and a 12-year-old boy from their mother in the middle of the night. They then smuggled the children into Mexico with clear goals in mind: to return the children to their control in Lev Tahor and to reunite the 14-year-old Jane with her adult husband so that they would continue their illegal sexual relationship. The defendants and the rest of the Hanhala had required Jane to "marry" Mayer's son, Jacob, when Jane was 13 years old and required them to regularly have sex. Upon Jane's return to Lev Tahor, the sexual relationship between Jane and her adult husband would have continued with the goal of procreation, despite her young age. What's more, the defendants knew that by removing Jane and John from their mother's care he was blatantly violating a Kings County Family Court order that granted the mother custody.

Each of the three defendants had substantial roles in the kidnapping:

- Yakov's role in the kidnapping was anchored in Guatemala. He took over primarily leadership of Lev Tahor in Guatemala to allow for the other leaders to leave Guatemala and execute the kidnapping. From Lev Tahor's community in Guatemala, Yakov organized the community in saying a prayer for Jane at the exact time that the kidnapping was taking the place, and created the dedication page of the prayer book for Jane. Yakov also communicated with individuals in New York and told them that Jane should be returned to her husband. Yakov also assisted in the recruitment of Shimon Malka in the days before the kidnapping and by pressuring Shimon to get out of the country once the kidnapping was underway. Finally, Yakov communicated with Shmiel during the kidnapping about using credit cards of Lev Tahor members so that Shmiel and Yoil could continue to move around with Jane and John without being tracked or caught.

- Shmiel acted as the project manager of the kidnapping. He was involved in nearly all the details—from managing Jane's every move in November 2018, to booking the hotel that was used immediately after the kids were taken, to picking up Jane and John and riding with them to the airport. In addition, Shmiel met his brother, Yoil, in Mexico and harbored Jane and John once the other members of the conspiracy had been detained.

- Yoil was one of the first Lev Tahor members to speak with Jane once she got to the United States and the defendants started conspiring about how to take her back to Lev Tahor. This contact made sense because Yoil was one of the people that Jane was instructed to call if she got separated from the community. In addition, Yoil, who was in Mexico with Mayer Rosner while the kidnapping was being planned, and he participated in phone calls with Shmiel about the kidnapping plan with the others in New York. Once Jane and John arrived in Mexico, Yoil met them at a hotel in Mexico City. And finally, after several members of the conspiracy were detained by Mexican law enforcement, it was Yoil and Shmiel who took the kids and travelled around Mexico evading law enforcement.

For these substantial roles in the kidnapping and their leadership positions in Lev Tahor, the defendants require substantial terms of imprisonment.

The egregiousness of the defendants' conduct is only compounded by the fact that the kidnapping of Jane was, at least in part, for the purpose of returning the innocent young children to the control of the Hanhala. Had the defendants succeeded in returning Jane to Lev Tahor, Jane would almost certainly have faced years in an illegal marriage to her adult husband and the total control of all aspects of her life, including sex, by the Lev Tahor leadership team. The kidnapping was part of a greater effort by the Hanhala to maintain absolute control over Lev Tahor and its most vulnerable members: women and children.

*Second*, the defendants' history and characteristics reflect the need for sentences greater than twelve years' imprisonment. Each of the three defendants were leaders of Lev Tahor in some capacity. They spent their time and energy recruiting members and then controlling every aspect of their lives. Together, along with other leadership, the leaders enforced a brutal regime of oppression, including monitoring of members, psychological manipulation, frequent beatings, and forced marriages for 12 and 13-year-olds. (Trial Tr. 355-58). The Hanhala also regularly split up families and used their control over family life in the community as a lever of power. (*Id.*). In fact, testimony at trial established the close involvement of both Yoil and Yakov

in controlling they sex lives of minors. Menachem Malka and Adam Brudveski each testified about conversations with and pressures from the defendants. This leadership role that the defendants played in the Lev Tahor community and their willingness to enforce community rules that were contrary to law should be factors into the Court's sentence.

**Third**, the sentences must protect the victims and the public from future crimes by the defendant. To this day, the defendants have failed to accept responsibility for the criminality of their actions and the harm it caused. The defendants have shown no contrition or acceptance of responsibility for their involvement in fostering illegal sexual relationships or their role in the December 2018 kidnapping. Nor has Yakov accepted responsibility for his attempted kidnapping in March 2019. Accordingly, the Government has no confidence that the Weingartens will not return to arranging child marriages and kidnapping escapees from Lev Tahor the day they leave prison. In fact, the defendants and the string of co-defendants who came into court and testified on their behalf continued to defend their practices of underage marriage. A sentence greater than twelve years is therefore necessary to protect the victims and the public from future crimes by the defendant.

**Fourth**, and relatedly, a sentence of greater than twelve years is incarceration is necessary to deter others from committing similar crimes. The defendants' crimes stemmed from their insistence that ordinary laws do not apply to them; that they can take whatever actions they deem righteous, advantageous, no matter the consequences; and that they were merely "rescuing" Jane and John Doe. But the defendants' unapologetic support for underage sexual relationships and their defiant defenses at trial that they were merely "rescuing the children"—a defense that is untethered to the facts and manufactured through lies and obfuscation—suggests that they would repeat these efforts the day they are released from prison (and maybe even before then). As a result, the risk of recidivism and the need to protect the public and deter the defendants—and others similarly situated to them—weigh in favor of incapacitation through lengthy prison sentences. Put another way, because the defendants' conduct demonstrates a severe and sustained disregard for the law and for the lives of others, and because they have yet to accept responsibility for their actions, sentences greater than twelve years' imprisonment are necessary to achieve specific deterrence.

A strong message of general deterrence should also be sent to those considering taking children away from their parents. Indeed, the defendants and their co-conspirators attempted to kidnap Jane two additional times after the December 2018 kidnapping. The Court should therefore send a strong message that kidnapping children carries serious consequences.

**Fifth**, the Court's sentences must sufficiently promote respect for the law. Each of the defendants has persistently demonstrated a deep disrespect for the laws of the United States and other countries. They have each participated in and facilitated illegal marriages of young girls to adult men and made great efforts to conceal their practices. The defendants, along with the co-defendants also made efforts to put false, misleading and perjurious evidence before the Court. A substantial sentence of incarceration—and one which is greater than the mandatory minimum—will send a clear signal that the law is not advisory and that these crimes merit serious prison sentences.

**E.     Conclusion**

For the foregoing reasons, the Government asks the Court to impose sentences greater than twelve years' imprisonment, as such sentences would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     _____
Sam Adelsberg
Jamie Bagliebter
Jim Ligtenberg
Assistant United States Attorneys
(212) 637-2494  / 2236 /
(347) 758-0247